E-FILED
Friday, 15 May, 2020  10:09:55 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

AYANNA JOHNSON,               )
                             )
            Plaintiff,        )
                             )
     v.                       )     No. 19-cv-3062
                             )
ANDREW SAUL,                  )
Commissioner of Social Security,  )
                             )
            Defendant.        )

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Amber Ayanna Johnson appeals from the denial of her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 1381a and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Johnson filed a Motion for Summary Judgment and Memorandum of Law (d/e 14) (Johnson Motion).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 17).  The parties consented to proceed before this Court. Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered August 21, 2019 (d/e 12).  For the reasons set forth below, the Decision of the Commissioner is affirmed.

Johnson raised two issues on appeal:

ISSUES

I.   Whether the ALJ erred by failing to weigh fully the opinion of treating physician Priyanka Saigal, M.D. and in not considering the regulatory sections applicable to weighing non-controlling opinions of a treating physician; and

II.  Whether the errors were not harmless.

Johnson Motion, at  3.  Johnson raised no other errors on appeal.  Dr. Saigal opined about Johnson's functional limitations due to her mental impairments.  Certified Copy of Transcript of Proceedings before the Social Security Administration (d/e 7 and 8) (R.), at 1173-76.  The record is voluminous.  Given the limited issues raised by Johnson, and in the interest of judicial economy, the Court limits its statement of the facts to evidence relevant to the ALJ's decision regarding her functional limitations due to her mental impairments.

## STATEMENT OF FACTS

Johnson was born on February 20, 1976.  She was diagnosed with a learning disability in school and completed the eighth grade. She previously worked as a rag sorter/cutter.  Johnson has not worked since 2007 and she was not working at the time she filed her application for SSI on May 13, 2016.  Johnson suffered from the impairments of asthma, left shoulder impairment, degenerative disc disease, obesity, recurrent major

depression, and Cluster B Personality Traits.  R. 15, 20, 17, 19, 30, 40, 448, 449.

On August 29, 2015, Johnson saw licensed professional counselor Tanya Coates, M.Ed., L.P.C. at Coates' office in St. Louis, Missouri. Coates interviewed Johnson and completed a form entitled "BioPsychoSocial Assessment."  R. 445-50.  Johnson reported problems with anger, depression, stress, extreme hair loss, and family issues.  She had a poor relationship with her mother, and had been in an abusive relationship when she was 19.  She saw her primary care physician for depression symptoms after the father of her daughter was murdered.  She was diagnosed with depression at that time and her primary care physician prescribed antidepressant medication.  Johnson lived with her parents and her daughter.  Johnson's parents had a history of alcohol abuse and domestic violence.  Johnson was married but had separated from her husband, who was not her daughter's father.  Her husband was currently incarcerated.  Johnson told Coates that she isolated herself from others. She had attention problems and learning disabilities and had an Individualized Education Plan (IEP) when she was in school.  She had no legal problems.  R. 445-48.

Coates found that Johnson appeared well-kept with good grooming; she was oriented; her speech was spontaneous, fast, normal volume, normal articulation, normal pitch, and without push of voice; her affect was appropriate; she had no suicidal ideations; she had a low, dysthymic mood; and she had sleep disturbances, loss of interest in pleasurable activities, and feelings of helplessness / worthlessness. R. 450. Coates assessed Johnson with Major Depressive Disorder, Mood Disorder not otherwise specified, and Bereavement. R. 449-50.

On July 20, 2016, Johnson saw a physical therapist for evaluation of her left shoulder. Johnson told the therapist that she took care of her father and her daughter. She also stated that she had trouble gripping with her left hand, she could not use her left hand to drive, and she had problems turning left while driving. R. 453.

On August 3, 2016, Coates wrote a letter regarding her counselling of Johnson. Coates had been providing counseling services to Johnson since August 2015. Coates' diagnosis of Johnson remained the same, Major Depressive Disorder, Unspecified Mood Disorder, and Bereavement. Johnson's primary care physician prescribed medication for Johnson's condition. Coates said that Johnson "has made very little progress to date in treatment goals related to learning appropriate coping skills, reducing

symptoms of anxiety with alternative coping skills and to increase

community (outdoor) interaction to help reduce depressive symptoms." R.

444.

On August 19, 2016, state agency psychologist Dr. Steven Akeson,

Psy.D., prepared a Psychiatric Review Technique and a Mental Residual

Functional Capacity Assessment.  R. 75-76, 80-82.  Dr. Akeson opined that

Johnson had an affective disorder and that Johnson had moderate

difficulties maintaining social functioning and concentration, persistence, or

pace.  R. 76.  Dr. Akeson opined that Johnson was moderately limited: in

understanding, remembering, and carrying out detailed instructions; in

working in coordination or proximity to others without getting distracted; in

interacting with the general public; in accepting instructions and responding

appropriately to criticism from supervisors; and in responding to changes in

work settings.  R. 80-81.  Dr. Akeson concluded:

> The claimant retains the capacity to acquire and retain at least
> simple and possibly moderately-complex instructions, and to
> sustain concentration and persistence with at least simple
> repetitive tasks and possibly moderately-complex  tasks. The
> claimant can adapt to changes in settings which do not require
> frequent public contact or very close interaction with others in
> the workplace.

R. 82.

On September 22, 2016, Johnson saw advanced practice nurse Ann Armstrong, APRN-CNP, at St. Mary's Health Center in St. Louis, Missouri (St. Mary's), for a follow-up on Johnson's asthma and sleep apnea.  R. 605-08.  On examination, Johnson had normal mood and affect, normal behavior, and normal judgment and thought content.  R. 607.

On November 22, 2016, Johnson saw R. Timothy McCann, M.D., at Affina Healthcare in St. Louis, Missouri, for body pain and diabetes.  R. 961-66.  Affina Healthcare is a clinic staffed by residents and supervising physicians from the Schools of Medicine at St. Louis University, Washington University, and an Osteopathic College.  R. 27 n.2; see Johnson Motion, at 11.  Dr. McCann appears to have been a supervising physician rather than a resident.  He was not under the supervision of another physician.  Johnson completed a PHQ-2 patient health questionnaire screening for depression.  Her score was 0, indicating that further testing was not required.   R. 961.

On December 19, 2016, Johnson saw Dr. McCann for her diabetes.  R. 944-49.  Johnson completed a PHQ-2 patient health questionnaire

screening for depression.  Her score was 0, indicating that further testing was not required.   R. 944.[1]

On February 16, 2017, Johnson saw Dr. McCann for a draining abscess on her right abdomen.  R. 906-12.  Johnson completed a PHQ-2 patient health questionnaire screening for depression.  Her score was 0, indicating that further testing was not required.   R. 906.  Dr. McCann renewed Johnsons' prescription for  Celexa.  The prescription was originally written on June 27, 2016.  907.

On February 27, 2017, Johnson saw licensed clinical social worker Justin Hampton, LCSW, at Affina Healthcare for a psychotherapy session. R. 899-901.[2]  Hampton observed that Johnson's mood was depressed and angry; her affect was full, but somewhat blunted; her speech was clear; her thought processes were logical; her perception, thought content, cognition, and judgment were within normal limits; and her intelligence was average. Johnson denied having any hallucinations and none were evident, and Johnson denied any delusions.  R. 899-900.   Johnson reported depressive moods with sadness, inappropriate guilt, lethargy, increased appetite, sleep disturbance, and crying spells.  She reported grief over the death of her

---

[1] A PHQ-2 score of three or greater indicates a major depressive disorder is likely. www.hiv.uw.edu last visited 5/14/2020.
[2] Hampton's credentials as a licensed clinical social worker are noted at R. 904.

brother a month earlier and the death of her daughter's father several years earlier.  She felt guilt over the death of her daughter's father and reported nightmares connected to him.  Hampton said Johnson's primary problem was dealing with anger.  She reported that she sometimes became physically aggressive due to her anger.  Johnson denied any suicidal or homicidal ideations.  Hampton assessed major depressive disorder, recurrent, moderate; and posttraumatic stress disorder (PTSD), chronic.  R. 900.

On March 1, 2017, Johnson saw psychologist, Dr. Beverly Field, Ph.D., for a Pain Psychology Initial Evaluation at the Washington University Pain Management Center at Barnes-Jewish Hospital in St. Louis, Missouri (Pain Center).  R. 663-64.  The evaluation was part of a multidisciplinary evaluation related to Johnson's chronic pain.  Johnson reported to Dr. Field that she lived with her parents and her 14-year old daughter, and said that she spent most of her time in bed isolating herself from others.  Dr. Field's mental status examination showed that Johnson was oriented, her memory was intact, her attention/concentration was normal, her speech was normal, her thought processes were logical and goal oriented, and her affect was euthymic.  Johnson showed no signs of hallucinations or delusions.  She had thoughts about suicide, but no plan or intent.  She had trouble staying

asleep at night and denied taking naps.  R. 663-64.  Dr. Field found that
Johnson presented with irritability, disrupted sleep, feelings of depression,
increased appetite with weight gain, and suicidal thoughts although she
denied plan or intent.  Dr. Field believed she would benefit from adjustment
to her medication or referral to a psychiatrist.  Dr. Field believed Johnson
was an excellent candidate for a multidisciplinary pain management
program and she needed a scholarship to attend the program.  R. 664.

On March 8, 2017, Johnson saw Hampton for a psychotherapy
session.  R. 894-95.  Hampton observed that Johnson's mood was
depressed and angry; her affect was constricted; her speech was clear; her
thought processes were logical; her perception and thought content were
within normal limits.  Johnson denied having any hallucinations and none
were evident, and she denied any delusions.  R. 894.  Johnson had a
problem with her daughter's teacher.  Johnson dealt with her anger with
verbal arguing and threats.  She wanted to learn how to respond and get
her message across effectively without becoming aggressive.   Hampton
again  assessed major depressive disorder, recurrent, moderate; and
PTSD, chronic.  R. 895.

On March 15, 2017, Johnson saw Hampton for a psychotherapy
session.  R. 877-78.   Hampton observed that Johnson's mood was

depressed and angry; her affect was constricted; her speech was clear; her thought processes were logical; and her perception, thought content, and insight were within normal limits.  Johnson's memory was impaired.  Her judgment was within normal limits.  She denied having any hallucinations and none were evident, and she denied any delusions.  R. 877-78.  Johnson reported problems because the anniversary of her daughter's father's death was approaching.  She had limited success counting to 50 before responding.  People told her she had to move on, but she could not and felt stuck.  Hampton again  assessed major depressive disorder, recurrent, moderate; and PTSD, chronic.  R. 878.

On March 24, 2017, Johnson saw advanced practice nurse Armstrong at St. Mary's for a routine follow up on her asthma and sleep apnea.  R. 609-15.  On examination, Johnson had normal mood and affect, normal behavior, and normal judgment and thought content.  R. 611.

On April 7, 2017, Johnson saw Hampton for a psychotherapy session.  R. 871-72.   Hampton observed that Johnson's mood was euthymic; her affect was full; her speech was clear; her thought processes were logical; and her perception, thought content, cognition, and insight were within normal limits.  Her judgment was within normal limits.  Johnson denied having any hallucinations and none were evident, and she denied

any delusions.  R. 871-72.  Johnson was in a slightly improved mood.  She had a physical altercation with her daughter but controlled herself and walked away.  She reported that her daughter has autism and schizophrenia.  Johnson reported some concerns about her memory.  Hampton suggested methods to keep lists to help remember.  Hampton assessed major depressive disorder, recurrent, moderate; and PTSD, chronic.  R. 872.

On April 17, 2017, Johnson saw Dr. Robert A. Swarm, M.D., at the Pain Center.  R. 649-53.  On examination, Johnson was alert and oriented.  She had normal insight and judgment, intact memory, and normal mood and affect.  R. 652.

On April 21, 2017, Johnson saw Hampton for a psychotherapy session.   R. 868-70.  Hampton observed that Johnson's mood was euthymic; her affect was full; her speech was clear; her thought processes were logical; and her perception, thought content, cognition, and insight were within normal limits.  Her intelligence was average and her judgment was within normal limits.  Johnson denied having any hallucinations and none were evident, and she denied any delusions.  R. 868-69.  Johnson reported that she was living with her mother and that she and her mother

were fighting.  She denied any major conflict with her daughter.  Hampton

noted:

> She has denied delusions (though reports some possibly
> paranoid social  cognitions) and denies hallucinations (though
> she has what sounds like vivid thoughts related to
> past/traumatic experiences).  Will need to continue to assess.
> We discuss that she will receive ongoing assessment and still
> has her psychiatry intake set for May 10 that may or may not
> result in a medication change.

R. 869.

On May 2, 2017, Johnson saw Dr. McCann for diabetes.  R. 849-54.

Johnson completed a PHQ-2 patient health questionnaire screening for

depression.  Her score was 0, indicating that further testing was not

required.   R. 849.

On May 10, 2017, Johnson saw Dr. Priyanka Sarihan, M.D., at Affina

Healthcare for a psychiatric diagnostic evaluation.  R. 831-33.  Dr. Mirela

Marcu, M.D., was the supervising provider.  R. 833.  Dr. Sarihan assessed

major depressive disorder, recurrent, moderate and prescribed Abilify.  R.

832.  Dr. Sarihan did not include any narrative notes or comments.  Dr.

Marcu commented:

> Supervising Comments -Pt has hx of depression, trauma and
>     psychotic sx
> Denies SI/HI , appears to talk to herself/dissociate?
> Agree, add Ability for mood swings, psychosis and augumentor
>     for depression.

R. 833.

On May 16, 2017, Johnson saw Dr. Swarm at the Pain Center.  R. 642-48.  On examination, Johnson was alert and oriented.  She had normal insight and judgment, intact memory, and normal mood and affect.  R. 647.

On June 23, 2017, Johnson saw Hampton for a psychotherapy session.  R. 803-04.  Hampton observed that Johnson's mood was euthymic; her affect was full; her speech was clear; her thought processes were logical; and her perception, thought content, cognition, and insight were within normal limits.  Her judgment was within normal limits.  Johnson denied having any hallucinations and none were evident, and she denied any delusions.  R. 803-04.  Johnson had some periods of frustration and anger, but she responded well to them.  She was adhering to her medication and had nothing negative to report.  Hampton assessed PTSD, chronic, and unspecified mood [affective] disorder.  R. 804.

On July 13, 2017, Johnson saw Hampton for a psychotherapy session.  R. 784-85.  Hampton observed that Johnson's mood was depressed; her affect was full; her speech was clear; her thought processes were logical; and her perception, thought content, cognition, and insight were within normal limits.  Her judgment was within normal limits.  Johnson denied having any hallucinations and none were evident, and she

denied any delusions.  R. 784-85.  Johnson reported her brother was being released from incarceration and she was worried his return would cause conflict within the family.  She planned to avoid her brother's influence. Hampton assessed PTSD, chronic, and unspecified mood [affective] disorder.  R. 785.

On July 17, 2017, Johnson saw Dr. Swarm at the Pain Center.  R. 635-41.  On examination, Johnson was alert and oriented.  She had normal insight and judgment, intact memory, and normal mood and affect.  R. 639.

On July 18, 2017, Johnson saw Dr. McCann.  R. 774-79.  Johnson completed a PHQ-2 patient health questionnaire screening for depression. Her score was 0, indicating that further testing was not required.   R. 774, 777.

On July 27, 2017, Johnson saw Hampton for a psychotherapy session.  R. 767-68.  Hampton observed that Johnson's mood was irritable; her affect was full; her speech was clear; her thought processes were logical; and her perception, thought content, cognition, and insight were within normal limits.  Her judgment was within normal limits.  Johnson denied having any hallucinations and none were evident, and she denied any delusions.  R. 767-68.  Johnson had an altercation with her daughter while they were on vacation.  She believed she handled the incident okay.

Johnson enjoyed her vacation, other than the incident with her daughter; she went shopping and went to the pool and said she was compliant with her medication and was happy with her medication.  Hampton assessed PTSD, chronic, and unspecified mood [affective] disorder.  R. 768.

On August 2, 2017, Johnson saw Dr. Ryan Bradley Sondergard, D.O., at Affina Healthcare for a medication management and psychotherapy session.  R. 764-66.  Dr. Sondergard assessed major depressive disorder, recurrent, moderate.  Dr. Sondergard prescribed Wellbutrin and Trazodone, and increased the dosage of Abilify.  Dr. Sondergard did not include any narrative notes with his assessment.  R. 765-66.  Dr. Marcu was the supervising provider.  Dr. Marcu agreed with Dr. Sondergard's assessment and noted:

> Supervising Comments -Pt reports VH/possible flahbacks (sic)?
> poor sleep, nightmares
> Denies SI/HI, constricted affect
> Agree, increase Abilify, consider Prazosin

R. 766.

On September 5, 2017, Johnson saw Hampton for a psychotherapy session.  Hampton observed that Johnson's mood was euthymic; her affect was full; her speech was clear; her thought processes were logical; and her perception, thought content, cognition, and insight were within normal limits.  Her judgment was within normal limits.  Johnson denied having any

hallucinations and none were evident, and she denied any delusions.  R.

756-57.  Johnson said she had a good time going to Springfield, Illinois, to

see her sister on Labor day.  Hampton assessed PTSD, chronic, and

unspecified mood [affective] disorder.  R. 757.

On September 6, 2017, Johnson saw Dr. Priyanka Saigal, M.D. at

Affina Healthcare for medication maintenance and psychotherapy session.

R. 753-55.  Dr. Saigal assessed major depressive disorder, recurrent,

moderate.  R. 755.  Dr. Saigal's supervising physician, Dr. Catalina Belean,

M.D., approved of Dr. Saigal's assessment and plan with the following

comment:

> Supervising Comments -Reports improvement in voices ( less
> frequent) and depression ( 8/10).  Has therapy Q2W and sister
> is helping. Blunted affect. Agree, will increase Trazodone.
> Continue rest of meds. Continue therapy.

R. 755.

On September 26, 2017, Johnson saw Hampton for a psychotherapy

session.  Hampton observed that Johnson's mood was euthymic; her affect

was full; her speech was clear; her thought processes were logical; and her

perception, thought content, cognition, and insight were within normal

limits.  Her judgment was within normal limits.  Johnson denied having any

hallucinations and none were evident, and she denied any delusions.  R.

735-36.  Johnson reported that she was concerned about an upcoming

family trip to Chicago, Illinois, to visit her brother's grave.  She had mixed feelings about the visit.  Hampton assessed PTSD, chronic, and unspecified mood [affective] disorder.  R. 736.

On October 2, 2017, Johnson saw advanced practice nurse Armstrong at St. Mary's for a routine follow up on her asthma and sleep apnea.  R. 616-21.  Johnson reported that she was negative for depression and was not nervous or anxious.  R. 618.  On examination, Johnson had normal mood and affect, normal behavior, and normal judgment and thought content.  R. 619.

On October 13, 2017, Johnson saw Hampton for a psychotherapy session.  Hampton observed that Johnson's mood was angry and irritable; her affect was full; her speech was clear; her thought processes were logical; and her perception, thought content, cognition, and insight were within normal limits.  Her judgment was within normal limits.  Johnson denied having any hallucinations and none were evident, and she denied any delusions.  R. 729-30.  Johnson had gotten upset in the prior week due to arguments with her mother and her brother who had recently been released from prison.  She also had problems with her daughter's behavior at school.  School representatives contacted her frequently.  Johnson was compliant with her medications, was sleeping "okay", and had no other

"distressing symptoms."  Hampton omitted an assessment or diagnosis from his notes in the record.  R. 730.

On October 18, 2017, Johnson saw Dr. Ankita Kantilal Vora, M.D., at Affina Healthcare for a medication management and psychotherapy session.  R. 726-28.  Dr. Vora assessed major depressive disorder with psychotic features, recurrent episode.  Dr. Vora did not provide any additional notes or findings regarding Johnson's mental status and increased the dosage of Wellbutrin.  The supervising provider Dr. Anjan Bhattacharyya, M.D., approved Dr. Vora's assessment without additional comment.  R. 728.

On October 30, 2017, Johnson saw Dr. Swarm at the Pain Center.  R. 630-34.  On examination, Johnson was alert and oriented.  She had normal insight and judgment, intact memory, and normal mood and affect.  R. 633.

On October 31, 2017, Johnson saw Hampton for a psychotherapy session.  R. 719-21.  Hampton observed that Johnson's mood was irritable; her affect was full; her speech was clear; her thought processes were logical; and her perception, thought content, cognition, and insight were within normal limits.  Her judgment was within normal limits.  Johnson denied having any hallucinations and none were evident, and she denied

any delusions.  R. 719-20.  Johnson reported periods of irritability.  She went to Springfield, Illinois, the previous weekend to her sister's residence to get away and she had some family conflict while she was there. Johnson had no negative effects from the medication change Dr. Vora prescribed at the October 18, 2017, visit.  She was still having problems with family members, including her daughter.  Hampton assessed PTSD, chronic, and unspecified mood [affective] disorder.  R. 720.

On November 7, 2017, Johnson saw Dr. Swarm at the Pain Center. R. 622-29.  On examination, Johnson was alert and oriented.  She had normal insight and judgment, intact memory, and normal mood and affect. R. 627.

On November 21, 2017, Johnson saw Hampton for a psychotherapy session.  Hampton observed that Johnson's mood was euthymic; her affect was full; her speech was clear; her thought processes were logical; and her perception, thought content, cognition, and insight were within normal limits.  Her judgment was within normal limits.  Johnson denied having any hallucinations and none were evident, and she denied any delusions.  R. 712-13.  Johnson had problems with low energy and disturbed sleep.  She attributed the problems to taking care of her "father's health needs."  R. 713.  Johnson still had conflicts with her daughter, mother, and other family

members.  Hampton assessed PTSD, chronic, and unspecified mood

[affective] disorder.  R. 713.

On November 22, 2017, Johnson saw Dr. Saigal at Affina Healthcare

for a medication management and psychotherapy session.  R. 710-11.  Dr.

Saigal assessed major depressive disorder with psychotic features,

recurrent episode.  R. 710.  Dr. Saigal's supervising physician Dr. Belean

agreed with the following comment:

> Supervising Comments -Grieving for her brother. Improvement
> in the frequency of the voices, last heard was 3 days ago, told
> her to come to the grave and that he loves her. Denies SI. Well
> groomed, blunted affect. Agree, continue meds. needs grief
> therapy.

R. 711.

On December 8, 2017, Johnson saw Hampton for a psychotherapy

session.  Hampton observed that Johnson's mood was anxious; her affect

was full; her speech was clear; her thought processes were logical; and her

perception, thought content, cognition, and insight were within normal

limits.  Her judgment was within normal limits.  Johnson denied having any

hallucinations and none were evident, and she denied any delusions.  R.

704-05.  Johnson felt stressed at this visit.  Her father recently went back

into the hospital but was out again and she had a "large amount of his

caretaking responsibilities" when he returned from the hospital.  R. 705.

Hampton assessed PTSD, chronic, and unspecified mood [affective] disorder.  R. 705.

On January 9, 2018, Johnson saw Hampton for a psychotherapy session.  Hampton observed that Johnson's mood was euthymic; her affect was full; her speech was clear; her thought processes were logical; and her perception, thought content, cognition, and insight were within normal limits.  Her judgment was within normal limits.  Johnson denied having any hallucinations and none were evident, and she denied any delusions.  R. 679-80.  Her father's health was declining, and as a result, she and most of her family were watching and taking care of him.  Her sleep was "on and off" and her energy was good.  She was happy with her medications.  Hampton assessed PTSD, chronic, and unspecified mood [affective] disorder.  R. 680.

On January 10, 2018, Johnson saw Dr. Saigal for medication management with psychotherapy.  Dr. Saigal assessed major depressive disorder with psychotic features, recurrent episode.  Dr. Saigal did not provide any additional notes or findings regarding Johnson's mental status.  The supervising provider Dr. Bhattacharyya approved Dr. Saigal's assessment without comment.  R. 728.

On January 26, 2018, Johnson saw Hampton for a psychotherapy session.  Hampton observed that Johnson's mood was depressed, and her thought content was depressive; her affect was full; her speech was clear; her thought processes were logical; and her perception, cognition, and insight were within normal limits.  Her judgment was within normal limits.  Johnson denied having any hallucinations and none were evident, and she denied any delusions.  R. 666-67.  Her sleep was again "on and off" and she had decreased energy.  Her appetite was up, which was a sign of depression for her and she still had conflicts with her mother.  She went to Springfield, Illinois, for her sister's birthday, and she was still taking an active role in caring for her father.  She "continues dealing with his deteriorating physical health and dementia."  Hampton changed his assessment to major depressive disorder, recurrent, unspecified; and trauma-related disorder not otherwise specified.  R. 667, 671.

On February 6, 2018, Coates wrote a letter regarding her counselling history with Johnson.  Coates again diagnosed Johnson with major depressive disorder, unspecified mood disorder, and bereavement / grief and loss.  Coates said that "various circumstantial factors" impeded Johnson's ability to achieve her counseling goals, including "family deaths,

dealing with alopecia, caring for elderly parents, raising a disabled child and cognitive deficiencies." R. 493.

On February 14, 2018, Dr. Saigal prepared a Medical Source Statement form for Johnson.  ?R. 1173-76.  Dr. Saigal opined that Johnson was mildly limited in maintaining personal hygiene and asking simple questions or asking for help; moderately limited in functioning independently; markedly limited in performing tasks without losing control and relating to family or caregivers; and extremely limited in maintaining emotional stability and avoiding excessive argumentativeness.  R. 1174. Dr. Saigal opined that Johnson could follow simple instructions by supervisors for non-detailed tasks, could perform work in circumstances that involved casual and infrequent contact with the public;  but could not work in proximity to coworkers without becoming distracted and distracting others.  R. 1174.  Dr. Saigal opined that Johnson could maintain concentration, persistence, or pace for 15 minutes, and Johnson would work at a full-time job at a pace that was 21 to 50% below average.   Dr. Saigal opined that if Johnson worked full-time, her mental impairments would cause her to be late for work three times a month or more and be absent three times a month or more.  R. 1175.  Dr. Saigal stated that Johnson's onset date was May 10, 2017, by her history with Affina

Healthcare.  Dr. Saigal did not see Johnson in May 2017.[3]  Dr. Saigal

diagnosed Johnson with major depressive disorder recurrent with psychotic

features; Cluster B traits; and ruled out PTSD.  Dr. Saigal concluded:

> Patient is emotionally unstable, has anger outbursts and gets
> into physical fights.  Continues to feel depressed, is also
> hearing voices.  Grieving over deaths in her close family.

R. 1176.

## THE EVIDENTIARY HEARING

On April 10, 2018 the Administrative Law Judge (ALJ) conducted an

evidentiary hearing.  R. 36-64.  Johnson appeared with her counsel.

Vocational expert Dr. Darrell Taylor, Ph.D., also appeared.  R. 38; see R.

227-29 (Dr. Taylor's vita).

Johnson testified first.  She completed the eighth grade at school and

was expelled after an altercation in which two girls with knives attacked her.

R. 40-42.  She was married, but she was separated from her husband.

She had a fifteen-year old daughter and she and her daughter lived with

her mother and father.  R. 43-44.

Johnson worked for seven years for U.S. Wiping Materials Company.

She cut up rags, both by hand and by machine and took six to seven

---

[3] The ALJ stated that Dr. Saigal signed as the treating physician at the May 10, 2017 visit.  R. 27. Dr. Sarihan signed as the treating physician at this visit.  R. 831-33.  Dr. Saigal stated in her opinion that a different doctor saw Johnson on this date.  R. 1175.  Drs. Sarihan and Saigal have the same first name, Priyanka, which may have been the basis for the ALJ's statement.

months to learn how to do the job.  R. 44. The rags were used in automobile production.  R. 45.  Johnson resigned because of problems with asthma, migraine headaches, and back pain from lifting.  She lifted boxes weighing 25 to 30 pounds.  R. 45-46.  Johnson also worked part-time for a temporary agency, Express Services in 2007.  She did not work after 2007. R. 46.

At the time of the hearing, Johnson was taking medications for depression.  She did not have any side effects from the medication.  She said that she heard and saw things that other people did not see or hear and that she had hallucinations three to four days a week.  She used to have hallucinations every day.  The medications reduced the number of hallucinations.  R. 47-48.

Johnson slept three to four hours a night and she took naps during the day twice a week.  R. 48-49.  Johnson cried every day multiple times a day.  She regularly had emotional outbursts and she had physical fights with others three to four days a month.  She fought with anyone, both strangers and people she knew.  The police have come, but they never have taken anyone away in custody. R. 49-50.

Johnson said she did not interact with her parents or her daughter with whom she lived.  She spent most of her time in her room and she did

not go to any of her daughter's school events or parent-teacher

conferences.  Johnson did some chores around the house if her mother

asked her.  The chores included taking out the trash and washing dishes.

R. 50-51.   Johnson showered twice a week and she watched television in

her room about three days out of the month.  She could not focus on a 30-

minute show from beginning to end.  Most of the time she just stayed in her

room with the blinds closed and walked around in her room.  R. 52-53.

Johnson said that she did not have any hobbies.  R. 55.

Johnson went to the store once or twice a month, always with

someone.  She did not pick out items personally in the store.  She just went

along for the ride and often stayed in the car while the other person

shopped.  R. 51-52.

 Johnson saw her counselor Justin Hampton twice a month.  She

mistakenly said that his last name was Hamilton.  Her depression was a

greater factor in keeping her from working than her back impairments.  R.

53.

Johnson said that she did not have a driver's license and that she

had never had a driver's license.  R. 55.  Her family or friends drove her to

work when she was working.  R. 56.

Dr. Taylor, the vocational expert, then testified.  Dr. Taylor classified

Johnson's past work as a rag cutter/sorter, light and unskilled.  R. 58.  The

ALJ asked Dr. Taylor the following hypothetical question:

> First of all, we have a younger individual under the age of 50,
> with an eighth grade education, no GED, which is limited, and
> then the past work history that you just classified.  I'll start with
> the light hypo, 20 pounds occasionally, 10 pounds frequently;
> standing and walking a total of six hours in eight, sitting a total
> of six hours in eight; no ladders, ropes, or scaffolds; balancing,
> kneeling, crouching, crawling, stooping, ramps and stairs would
> all be occasional; no concentrated exposure to pulmonary
> irritants.  I'll define that as no work environment with airborne
> particulates from, for example, grinding or sand processes, and
> no unventilated, noxious fumes; no whole-body vibration .
>
> Exposures to temperatures 20 degrees and below should
> be 30 minutes maximum at a time.  Let's see. In terms of the
> mental work-related demands, the job should be simple, routine
> tasks.  Any changes should be the same changes daily. The
> tasks need to involve working primarily with things rather than
> other people, and they need to be tasks that can be performed
> independently.  And I'm sure there is no job that can be done in
> 100 percent social isolation, so beyond these restrictions,
> interaction needs to be with coworkers and supervisors only,
> occasional at maximum, superficial at maximum, in other
> words, no mediation, arbitration, negotiation, confrontation with
> others or supervision of others, no direct interaction with the
> general public.
>
> Could such a person do the past work?

R. 58-59.  Dr. Taylor opined that such a person could not perform

Johnson's prior work as a rag cutter.  R. 59.   Dr. Taylor opined that such a

person could perform unskilled hand packer positions, with 315,000 such

jobs in the national economy; unskilled production worker assembler positions, with 196,000 such jobs in the national economy; and unskilled cleaner positions, with 440,000 such jobs in the national economy.  R. 59.

The ALJ asked Dr. Taylor to assume the person otherwise described in the hypothetical question was limited to lifting and carrying five pounds, walking one-half block at a time, standing for 10 minutes at a time.  Dr. Taylor opined that such a person would be limited to sedentary work.  Dr. Taylor opined that such a person could perform sedentary unskilled hand packer positions, with 22,000 such jobs in the national economy; sedentary unskilled production worker assembler position, with 25,000 such jobs in the national economy; and unskilled inspector/tester/sorter positions, with 12,000 such jobs in the national economy.  R. 59-60.

Dr. Taylor said that two absences in one month or one absence a month for two consecutive months would result in termination from these jobs.  He said that being off-task more than 10 percent of the time at work would result in termination.  R. 60-61.  The hearing concluded.

## THE DECISION OF THE ALJ

On September 13, 2018, the ALJ issued his decision.  R. 15-31.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.

Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden of presenting evidence on the last step; the

Commissioner must present evidence that, considering the listed factors,

the claimant can perform some type of gainful employment that exists in

the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); <u>Weatherbee v.

Astrue</u>, 649 F.3d 565, 569 (7th Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>,

425 F.3d 345, 352 (7th Cir. 2005).

The ALJ determined that Johnson met her burden at Steps 1 and 2.

Johnson had not engaged in any substantial gainful activity since her  SSI

application date of May 13, 2016, and she suffered from the severe

impairments of asthma, left shoulder impairment, degenerative disc

disease, obesity, recurrent major depression, and Cluster B Personality

Traits.  R. 17.

The ALJ determined at Step 3 that Johnson's impairments or

combination of impairments did not meet or equal a Listing.  R. 18-20.

At Step 4, the ALJ found that Johnson had the following RFC:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform a range of light work as defined in 20 CFR 416.967(b).
> She can lift/carry up to 20 pounds occasionally and 10 pounds
> frequently, stand/walk a total of about 6 hours in 8, and sit a
> total of about 6 hours in 8.  She can never climb ropes, ladders
> or scaffolds, but she can occasionally climb ramps and stairs,
> balance, stoop, crouch, crawl, and kneel; she can have no
> concentrated exposure to pulmonary irritants (which is defined
> as no work environment with airborne particulates from, for
> example, grinding or sanding processes and no unventilated
> noxious fumes), no whole body vibration, and exposure to

temperatures 20 degrees and below should be limited to 30 minutes maximum at a time.  Mentally, the claimant can do simple routine tasks, where changes in duties are the same daily, the tasks involve working primarily with things rather than other people, and can be performed independently.  The claimant is restricted to occasional, superficial interaction with coworkers and supervisors only.  For this purpose superficial is defined as no mediation, arbitration, negotiation, confrontation of others or supervision of others.  She can have no direct interaction with the general public.

R. 21.  With respect to Johnson's limitations due to her mental impairments, the ALJ relied on Coates' normal clinical findings and Johnson's reports to Coates of activities such as caring for elderly parents and raising a disabled child with cognitive difficulties which the ALJ found to be inconsistent with Johnson's testimony that she spent most of her time in her room.  See R. 19-20, 25.  The ALJ also found Johnson's testimony that she did not drive inconsistent with her statement to her physical therapist that she had difficulty grasping the steering wheel due to her shoulder. The ALJ found that this statement to the therapist supported the conclusion that she drove.   The ALJ further found this evidence to be inconsistent with Johnson's claim that she spent most of her time in her room.  R. 25.  The ALJ also found the evidence that she went on trips with her family to be inconsistent with her testimony.  R. 25, 27.

The ALJ relied on Dr. Field's conclusion that Johnson was a good candidate for multi-modal pain management.  The ALJ relied on Dr.

Swarm's findings at the Pain Center that Johnson had normal insight, judgment, mood, and affect, and also administered PHQ-2 screenings for depression in which Johnson consistently scored 0 for depression, indicating no treatment was necessary .  The ALJ also relied on Hampton's notes that consistently found Johnson had a normal mental status, with the exceptions for her mood and affect for a few visits.  The ALJ found all these records inconsistent with Johnson's testimony that she spent her time in her room crying and that she regularly got in physical fights.    R. 27.

The ALJ gave some weight to Dr. Akeson's opinions.  The ALJ noted that Dr. Akeson did not have the benefit of Johnson's 2017 and 2018 mental records, but also noted that Dr. Akeson was "a program expert and has expertise in Social Security rules." R. 27.  The ALJ gave counselor Coates' opinion little weight because she was not an acceptable medical source and her opinions were inconsistent with Johnson's activities and the mental status findings in Hampton's psychotherapy session notes.  R. 27.

The ALJ determined that Dr. Saigal's opinions were not supported by the evidence and were inconsistent with other evidence in the record.  Dr. Saigal provided no treatment notes that identified signs or observations to explain her diagnoses.  The ALJ noted that Dr. Saigal was not the only treater at Affina Healthcare; other doctors at Affina Healthcare treated her

mental condition.  The ALJ found that Dr. Marcu's notes on May 10, 2017 mentioned hallucinations or delusions, but Dr. Marcu relied on Johnson's reports of her history, not medical signs or other evidence.  The ALJ noted that "the great weight of the medical evidence in all venues continually documents mental status signs that are devoid of any psychosis or hallucinations or delusions or signs of responding to internal stimuli."  R. 28.  The ALJ noted Dr. Belean's comment on September 6, 2017 that Johnson's depressive symptoms were improving, and Dr. Belean's comments on November 22, 2017, that Johnson's reports of hearing voices were reduced.   R. 28.

The ALJ noted that the October 2017 assessment by Dr. Vora was the first assessment of Johnson to include a reference to a psychotic feature.  The ALJ noted that Dr. Saigal's January 2018 notes did not mention any clinical findings or objective medical findings.  The ALJ stated, "Dr. Saigal did not make the initial change in the claimant's diagnosis to recurrent major depression with psychosis, nor was she present when it was made.  The only basis for the change was the claimant's complaints alone which can never be a basis for a diagnosis or finding of an impairment."   R. 28.

The ALJ addressed Dr. Saigal's functional opinions in light of other

evidence in the record:

> Dr. Saigal's opinion that the claimant could not maintain
> emotional stability or do tasks without losing self-control is
> inconsistent with the voluminous evidence that show she cares
> for a disabled child and father as well as relates well with
> doctors and other health care providers in a wide variety of
> settings, who never comment on any behavioral or mental
> status abnormality and frequently report pain levels of zero on a
> ten point scale which is also internally inconsistent with her
> physical allegations.  The only evidence about excessive
> arguments is the claimant's statements alone, which are
> inconsistent with her history free of legal difficulties or any
> doctor referring the claimant for mental health assistance by a
> psychiatrist prior to her own referral just a year before the
> hearing.  There is no basis to find the claimant could not
> perform in proximity to coworkers without being distracted by
> them or without distracting them. There is no  basis for stating
> the claimant cannot perform simple tasks more than fifteen
> minutes at a time as she answered questions at a hearing four
> times that long without any discernable difficulty due to mental
> health issues, and her reported activities of shopping and
> traveling to cities several hours away for family outings is
> inconsistent with that limitation.  Dr. Saigal has no basis for the
> claimant's being below production 21-50 percent of the time.
> The doctor's brief interactions in the records themselves
> indicate he is not qualified to make such an assessment, not to
> mention  the recited lack of any clinical signs or finding reported
> by that doctor.  Likewise his report the claimant would miss
> work three or more days a month or that the claimant would
> leave work early three or more times a month is not supported
> by any evidence in the longitudinal record or the psychiatric
> treatment notes or other notes in the extensive file.  The
> doctor's medical source statement lacks the supportability
> required in 20 CFR 416.927(c)(3) and the consistency required
> by (c)(4).

R. 28-29.

After determining Johnson's RFC, the ALJ determined at Step 4 that
Johnson could not perform her prior relevant work as a rag cutter.  The ALJ
relied on the opinion of Dr. Taylor.  R. 29-30.

At Step 5, the ALJ determined that Johnson could perform a
significant number of jobs that exist in the national economy.  The ALJ
relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P,
Appendix2, and the opinions of Dr. Taylor that a person with her age,
education, work experience, and RFC could perform representative jobs of
hand packer, unskilled assembler, and unskilled cleaner.  R. 30-31.  The
ALJ concluded that Johnson was not disabled.  R. 31.

Johnson appealed the decision of the ALJ.  On February 11, 2019,
the Appeals Council denied her request for review.  The decision of the ALJ
then became the final decision of the Defendant Commissioner.  R. 1.
Johnson then brought this action for judicial review.

<u>ANALYSIS</u>

This Court reviews the Decision of the Commissioner to determine
whether it is supported by substantial evidence.  Substantial evidence is
"such relevant evidence as a reasonable mind might accept as adequate"
to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).
This Court must accept the findings if they are supported by substantial

evidence and may not substitute its judgment or reweigh the evidence.
Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782
F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation
of statements regarding the intensity, persistence, and limiting effect of
symptoms unless the evaluation is patently wrong and lacks any
explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,
367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);
SSR 16-3p, 2017 WL 5180304 (October 25, 2017) (originally issued at
2016 WL 1119029 (March 24, 2016)), at *1 (The Social Security
Administration no longer uses the term credibility in the evaluation of
statements regarding symptoms).  The ALJ must articulate at least
minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d
329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical
bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863,
872 (7th Cir. 2000).

The ALJ's findings are supported by substantial evidence.  Johnson
does not challenge any of the ALJ's findings regarding the effect of her
physical condition on her functional ability to work.  The Court, therefore,
does not address those issues.  The ALJ's findings regarding her functional
limitations due to her mental impairments are supported by the opinions of

Dr. Akeson; the largely normal mental status findings from Hampton; the normal mental status findings by Dr. Field, advanced practice nurse Armstrong, and Dr. Swarm; the PHQ-2 screening questionnaires administered by Dr. McCann that showed no treatment for depression was needed; and the extensive treatment notes from Hampton.

Substantial evidence also supported the ALJ's findings that Johnson did not spend her days in her room.  Johnson cared for her disabled daughter and her father, she dealt with school officials regarding her daughter, she reported verbal conflicts with her mother, brother, and daughter; and she traveled several times to Chicago, St. Louis, and once on vacation with her daughter.  The notes from Johnson's physical therapist also supported the ALJ's conclusion that, contrary to her testimony, Johnson drove.  Johnson told the physical therapist that she could not grasp the steering wheel due to her shoulder problems and had difficulty turning left.

Many of the mental health specialists did not note psychotic features to Johnson's condition.  Hampton's notes consistently stated that Johnson denied hallucinations and he observed none, and she denied any delusions.  The assessments of Drs. Sarihan on May 10, 2017; Dr. Sondergard  on August 2, 2017; and Dr. Saigal on September 6, 2017, did

not include any psychotic features.   Dr. Vora on October 18, 2017 made the first assessment that included psychotic features.  All this evidence supported the ALJ's finding that Johnson's condition was not as functionally limiting as she claimed and also supported the ALJ's RFC finding that Hampton could perform a limited range of work that accommodated her mental impairments.

Johnson argues that the "the ALJ erred by failing to weigh fully the opinion of treating physician Priyanka Saigal, M.D. and in not considering the regulatory sections applicable to weighing non-controlling opinions; and . . . the errors were not harmless."  Johnson Motion, at 3.  Johnson forfeited any other issues.  Scheidler v. Indiana, 914 F.3d 535, 540 (7th Cir. 2019) ("A party . . . generally forfeits issues and arguments it fails to raise in its initial appellate brief.).

The Court finds no error in the ALJ's assessment of Dr. Saigal's opinions.  The ALJ must give the opinions of a treating physician controlling weight if the opinions are supported by objective evidence and are not inconsistent with other evidence in the record.  20 C.F.R. § 404.1527(c)(2); Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008).[4]  The ALJ explained in

---

[4] The Commissioner changed the regulations regarding the interpretations of medical evidence.  The amendments, however, apply prospectively to claims filed on or after the amendment's effective date of March 27, 2017. Revisions to Rule Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017).  As such, the amendments do not apply here.

detail, as quoted above, how Dr. Saigal's opinions were not supported by objective evidence and were inconsistent with other evidence in the record. The evidence cited by the ALJ provided substantial evidence for this finding.

Johnson argues that even if Dr. Saigal's opinion was not entitled to controlling weight, the ALJ erred by not considering the other relevant regulatory factors for assessing any opinion from an acceptable medical source.  The regulatory factors for evaluating non-controlling opinions are:

- the length of the treating relationship and the frequency of the examinations;

- the nature and extent of the treatment relationship;

- the supportability of the physician's opinions by objective signs and tests;

- the consistency of the opinion with the record as a whole;

- the specialization of the physician involved; and

- any other relevant factors based on the particulars of the treatment relationship and the opinions provided.

20 C.F.R. § 4040.1527(c)(3)-(c)(6).  Johnson argues that the ALJ erred by not considering all these factors in his decision.

The Court disagrees.  The ALJ was only required to minimally articulate his reasons for the weight given to Dr. Saigal's opinions; he was not required to go through a list of every factor.  See Elder, 529 F.3d at 415; Henke v. Astrue, 498 F.Appx. 636, 640 n.3 (7th Cir. 2012).   The ALJ more than met this standard.  The ALJ addressed the regulatory factors. The ALJ addressed in detail the length of Dr. Saigal's treatment relationship with Johnson and the nature of the relationship.  The ALJ set forth the evidence that Dr. Saigal was one of several residents under supervisory psychiatrists at Affina Healthcare who saw Johnson for her mental impairments.  The ALJ detailed the length of Johnson's mental health treatment at Affina Healthcare from May 2017 to January 2018.  The ALJ addressed whether Dr. Saigal's opinions were supportable by the evidence in the record.  The ALJ addressed the consistency of Dr. Saigal's opinions with the other evidence in the record.  The ALJ addressed Dr. Saigal's position as a resident under supervisory control of a psychiatrist rather than as a specialist.  The ALJ discussed the comments of the supervising psychiatric specialists Drs. Marcu and Belean when evaluating Dr. Saigal's opinions.  The ALJ also addressed other factors such as the inconsistencies between Dr. Saigal's opinions regarding Johnson's functional limitations and the other non-medical evidence in the record,

including Johnson's self-reports to Hampton, Coates, and others, that

showed greater functional ability.  The ALJ adequately addressed the

regulatory factors.  There was no error.  Johnson's arguments to the

contrary are not persuasive.

THEREFORE, IT IS ORDERED that Defendant Commissioner's

Motion for Summary Affirmance (d/e 17) is ALLOWED; Plaintiff Ayanna

Johnson's  Motion for Summary Judgment and Memorandum of Law (d/e

14) is DENIED, and the decision of the Defendant Commissioner is

AFFIRMED.  All pending motions are denied as moot.

THIS CASE IS CLOSED.


ENTER:   May 14, 2020



s/ *Tom Schanzle-Haskins*
_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE